# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### September 14, 2010 Session

## STATE OF TENNESSEE v. CHRIS JONES

**Appeal from the Criminal Court for Shelby County**
**No. 08-05720     John T. Fowlkes, Jr., Judge**

---

**No. W2009-01698-CCA-R3-CD  - Filed March 9, 2011**

---

The Defendant, Chris Jones, was charged with one count of first degree murder with respect to victim Donald Munsey; two counts of attempted first degree murder with respect to victims Justin Smith and David Eagan; one count of use of a firearm during the commission of a dangerous felony; and one count of possession of a firearm where alcoholic beverages are served. Following a jury trial, the Defendant was convicted of one count of second degree murder; one count of attempted second degree murder with respect to Mr. Smith; one count of attempted voluntary manslaughter with respect to Mr. Eagan; one count of use of a firearm during the commission of a dangerous felony; and one count of possession of a firearm where alcoholic beverages are served. In this appeal as of right, the Defendant contends that (1) the evidence was insufficient to sustain his convictions on the first three counts; (2) the trial court erred when it excluded testimony of Mr. Munsey's prior violent acts; (3) that the trial court erred in allowing the State to present evidence regarding the Defendant's recent divorce; (4) that the trial court erred in allowing the State to rehabilitate a witness with his prior consistent statement; and (5) that the Defendant's rights to trial by jury and due process were violated by the use of sequential jury instructions. Following our review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court are Affirmed.**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which ALAN E. GLENN and J.C. MCLIN, JJ., joined.

Leslie I. Ballin, Memphis, Tennessee (at trial and on appeal); and Richard S. Townley, Memphis, Tennessee (on appeal), for the appellant, Chris Jones.

Robert E. Cooper, Jr., Attorney General and Reporter; Rachel E. Willis, Assistant Attorney

General; Bret Thomas Gunn, District Attorney General, pro tem; and Katrin Novak Miller, Assistant District Attorney General, pro tem, for the appellee, State of Tennessee.

## OPINION

## FACTUAL AND PROCEDURAL BACKGROUND

### I. Factual Background

This case arises from a parking dispute which ultimately resulted in the death of Donald Munsey at the Windjammer karaoke bar in the early morning hours of March 14, 2008. The Defendant, a Shelby County Sheriff's Deputy at that time, began the evening of March 13, 2008, at T.J. Mulligan's sports bar, where he ordered eight beers and watched a basketball game. At halftime of the game, the Defendant spoke to fellow Shelby County Sheriff's Deputy Lawrence Bowling. The Defendant told Deputy Bowling that his divorce was recently finalized and that his ex-wife was keeping his children away from him and turning them against him. Deputy Bowling testified that he could tell the Defendant had been drinking. The Defendant also spoke with Cathey Lampley and her friend Mary[1] while he was at T.J. Mulligan's. The Defendant bought Mary a drink, and when Ms. Lampley and Mary decided to go to the Windjammer, the Defendant asked if he could follow them. They agreed and all three left T.J. Mulligan's. Ms. Lampley testified that the Defendant was not intoxicated when she spoke to him at T.J. Mulligan's. The bartender, Jason Koski, also testified that the Defendant was not intoxicated when he closed his bar tab. However, Mr. Koski admitted that at the time of trial, T.J. Mulligan's was involved in a civil suit for allegedly overselling alcohol to the Defendant.

### A. The Defendant's confrontation with Justin Smith

Justin Smith testified that he was sitting in his truck when the Defendant's truck "[j]ust came flying in around the corner . . . [and] almost hit [his] truck in parking." Mr. Smith further testified that he felt he would not be able to get his truck out of the parking spot because of the way the Defendant had parked his truck. However, Mr. Smith waited until the Defendant had gone inside the bar to speak to him about his truck. Once inside, the Defendant sat down with Ms. Lampley and Mary at a table near the front door and ordered a beer. Mr. Smith then approached the Defendant to discuss how the two trucks were parked. The testimony at trial presented several conflicting versions of exactly what was said during this conversation.

---

[1]Mary did not testify at trial, and her last name is not found in the record.

Kimberly Guest, the waitress working at Windjammer that night, testified that Mr. Smith asked the Defendant if it was his truck outside and "if he could possibly move it because . . . the trucks were close and [he] didn't want to hit his truck." Ms. Guest testified that "there was no indication that there was any kind of problem," there was no physical contact between the two men, and she did not hear any "threatening language." Stephanie Ravinuthala, a patron at the bar that night, testified that Mr. Smith asked the Defendant if he drove a gray truck and told the Defendant that he was "parked like three inches from [Mr. Smith's] bumper and [Mr. Smith could not] get out." Ms. Ravinuthala also testified that Mr. Smith did not appear to be belligerent and that she did not recall Mr. Smith cursing at the Defendant.

Mr. Smith testified that when he asked the Defendant to move his truck, the Defendant responded by saying "f--k you . . . I'm not moving it." On cross-examination, Mr. Smith repeatedly denied threatening or being aggressive with the Defendant but admitted that after the Defendant told him "f--k you," he was "rude" toward the Defendant. However, Ms. Lampley testified that Mr. Smith approached the Defendant intoxicated, "very loud, very arrogant" before asking the Defendant "if that was his f-----g truck outside." Ms. Lampley testified that the Defendant was very calm during this exchange and told Mr. Smith he would move his truck when Mr. Smith was ready to leave.

At some point after their conversation, both Mr. Smith and the Defendant went outside. Gary Miller was working at the front door, checking IDs, that night and testified that he overheard the two men "discussing the way the [trucks] were parked." Mr. Miller also testified that at some point two or three other men joined the conversation. According to Mr. Miller, the Defendant asked the men "did they not realize that he was a police officer by the tag that was on the truck." Mr. Miller further testified that there was no physical contact between the Defendant and any of the three or four people with him. Mr. Smith testified that he went outside with the Defendant because the Defendant "wanted to show me his license plate." The Defendant told Mr. Smith that "he was a cop and he had the tag on his truck." Mr. Smith testified that after their conversation outside, he did not speak to the Defendant again that evening.

Mr. Smith's friend, William Bobbitt, testified that he was near the front door when Mr. Smith and the Defendant went to look at the trucks. On their way back to the front door, Mr. Bobbitt overheard the Defendant say that he was not going to move his truck and that Mr. Smith should look at his license plate. Someone asked the Defendant what he meant by this, and he replied that he was a police officer. Mr. Bobbitt testified that the Defendant spoke with an aggressive tone but that there was no physical contact between the Defendant and anyone outside. Mr. Bobbitt further testified that everyone went back inside after Mr. Munsey stepped outside and told them to come in.

Ms. Lampley testified that before the Defendant and Mr. Smith went outside, Mr. Smith made a phone call and a short time later "[a]bout [ten] guys around the age of 21 to 25 showed up" and were looking at the Defendant. Ms. Lampley testified that the Defendant looked scared when he came back inside. Ms. Lampley testified that she felt threatened because this group of men continued to stare at the Defendant and her. However, on cross-examination Ms. Lampley admitted that she was "making some jump here . . . that Mr. Smith called people and that as a result of those calls, people arrived."

*B. The Defendant's confrontation with David Eagan*

After the Defendant reentered the bar, David Eagan approached him to discuss the parking situation.[2] Mr. Eagan testified that he was too intoxicated to remember everything that happened that night. However, Mr. Eagan testified that he spoke to the Defendant because the Defendant "was a little rowdy" and that he wanted "to make sure that . . . everything was okay" between the Defendant and Mr. Smith. Mr. Eagan testified that he "asked [the Defendant] to move his truck and . . . just to calm down and everything was going to be okay." Mr. Eagan testified that he could not remember anything else about his conversation with the Defendant. Mr. Eagan repeatedly denied threatening the Defendant or having a physical altercation with him. Mr. Eagan did admit on cross examination that he had described the conversation between Mr. Smith and the Defendant as "an altercation."

Several witnesses saw the confrontation between the Defendant and Mr. Eagan inside the bar. Ms. Ravinuthala testified that she saw Mr. Eagan "lean[] down into [the Defendant's] face" when he spoke to him and that the Defendant responded by standing up and getting in Mr. Eagan's face. Joe Reynolds was working at the bar that night and testified that he saw the Defendant and Mr. Eagan "talking about the parking place or something." Mr. Reynolds testified that the Defendant had an ink pen in his hand and was "gripping [it] so tight that his knuckles were white." Mr. Reynolds decided to get Mr. Eagan to move away from the Defendant. After seperating the two, Mr. Reynolds spoke with the Defendant. The Defendant told Mr. Reynolds "I'm a motherf-----g Shelby County Sheriff['s] Deputy and I [came] in here to drink my f-----g beer and I want to be left alone." Mr. Reynolds told him that everything was okay and to just have a drink and enjoy himself. Mr. Reynolds then went back to work and left the Defendant near the front door.

Several witnesses testified that after his conversation with Mr. Reynolds, the Defendant stood by a table and a stared at the bar where Mr. Eagan and Mr. Smith were standing. Pamela Flynn, her husband, John Flynn, and their friend, Ms. Ravinuthala, were

---

[2]Some of the witnesses testified that Mr. Eagan's conversation with the Defendant occurred outside the bar, but Mr. Eagan testified that he only spoke with the Defendant inside the bar.

seated at the table. All three testified that the Defendant was "actually standing almost on top" of Ms. Ravinuthala just staring towards the bar. At one point, Ms. Guest asked the Defendant to move so Ms. Ravinuthala would feel more comfortable.

Mr. Reynolds approached the Defendant and had a second conversation with him as the Defendant stared at Mr. Eagan and Mr. Smith. Mr. Reynolds asked the Defendant if he was okay, and the Defendant pointed at Mr. Eagan and said, "I'm going to kill that motherf----r righter there." Then the Defendant pointed at Mr. Smith and said, "I'm fixing to kill his punk ass buddy and if any of his buddies over there even approach me, I'm going to kill all of them motherf-----s." Mr. Reynolds told the Defendant to calm down, and the Defendant responded by saying, "I've lost my wife and I've lost my family and I've lost my home and I got nothing else to lose." Ms. Flynn and Ms. Ravinuthala both overheard the Defendant threaten to kill Mr. Smith and Mr. Eagan. Mr. Flynn overheard the Defendant say he had nothing left to lose. Ms. Flynn testified that the Defendant was clenching and unclenching his fists as he spoke with Mr. Reynolds. Mr. Flynn also testified that the Defendant seemed very upset as he spoke with Mr. Reynolds. Mr. Reynolds again told the Defendant to calm down but was called away to the office to answer a telephone call.

*C. The shooting*

After Mr. Reynolds left the Defendant, Mr. Eagan paid his bar tab and began to walk toward the door.[3] The Defendant pulled out a gun, ran toward Mr. Eagan, grabbed Mr. Eagan by his shirt collar, and put a gun to his head. Mr. Eagan testified that the Defendant said, "I'm going to kill you. I have nothing to lose."

The testimony at trial presented conflicting accounts of what happened next. Mr. Flynn testified that the bar was crowded that night and there were lots of people standing near the Defendant and Mr. Eagan. Ms. Guest testified that she was near the Defendant and overheard him say, "who's the tough guy now, motherf----r . . . the tough guy's got the gun." Ms. Guest further testified that she asked the Defendant "please don't do this" when Mr. Munsey grabbed the Defendant from behind. According to Ms. Guest, Mr. Eagan then fainted, knocking down the Defendant, Mr. Munsey, and Ms. Guest as he fell to the floor. Ms. Guest then heard two or three gunshots and saw that Mr. Munsey had been shot in the neck.

Mr. Bobbitt testified that he and Mr. Munsey were in the kitchen when they saw the Defendant grab Mr. Eagan. Mr. Bobbitt also testified that he did not see a gun from where

---

[3]Given the layout of the bar Mr. Eagan could have been walking toward the karaoke stage or the Defendant. However, Mr. Eagan testified that he was leaving when the Defendant attacked him.

they were standing. Mr. Bobbitt and Mr. Munsey then charged toward the Defendant and tackled him. All four men fell to the ground; however, Mr. Bobbitt testified that while the men were on the ground, no one hit the Defendant. Mr. Bobbitt also testified that Ms. Guest was not involved at all. Mr. Bobbitt then heard two gunshots and ran out of the building. Mr. Smith similarly testified that Mr. Bobbitt and Mr. Munsey tackled the Defendant. After hearing the first gunshot, Mr. Smith ran out the front door, and out of the corner of his eye, he saw the Defendant aiming the gun at him. Mr. Smith was then shot in the buttock. Mr. Eagan testified that he did not remember anything after he fell to the ground.

Mr. Flynn and Ms. Ravinuthala both testified that they saw Mr. Munsey tackle the Defendant and that both men and Mr. Eagan fell to the floor. Ms. Ravinuthala testified that she saw the Defendant and Mr. Munsey "wrestle" on the ground for a minute. The Defendant then pulled himself up, aimed his gun at Mr. Munsey's head, and fired it. Next, the Defendant turned and aimed his gun at Mr. Smith before firing a second time. Mr. Miller had left the bar earlier to run an errand, and when he returned, he discovered Mr. Munsey's body lying on the floor with Ms. Guest kneeling next to him. Mr. Miller saw the Defendant seated by the front door. He told the Defendant to remove the magazine from his gun and to lay them on a table, and the Defendant complied.

*D. The police investigation*

Officer Zane Lewis of the Memphis Police Department (MPD) was one of the first officers to arrive at the bar. Officer Lewis testified that the Defendant surrendered to him and his partner, and that he took the Defendant's gun into custody. Officer Jeffery Klein of the MPD testified that the Defendant was placed in his squad car after he was taken into custody. Officer Klein testified that during the time between his initial arrest and when the Defendant was brought to the police station, the Defendant repeatedly talked about his children and his recent divorce. Officer Klein testified that the Defendant never said he was attempting to arrest Mr. Eagan or that he was threatened by Mr. Eagan or Mr. Smith. Instead, the Defendant only said he had to shoot Mr. Munsey to save his life.

Lieutenant Don Crowe of the MPD Felony Response Bureau testified that he was in charge of the investigation. Lieutenant Crowe testified that two spent shell casings were found at the crime scene, that the Defendant's gun can hold up to nine rounds, and when the gun was taken into police custody, there were seven rounds remaining in the magazine. Lieutenant Crowe also testified that when the Defendant was brought to the police station, photographs were taken of injuries to his chin, left hand, and left elbow along with photographs of a red mark on his chest and redness on his right ear.

Dr. Miguel Laboy testified that Mr. Munsey died from an intermediate range gunshot wound to his neck. Dr. Laboy further testified that the fatal gunshot could have been fired from a few inches up to two feet away from Mr. Munsey. Dr. Laboy also testified that Mr. Munsey had tested positive for methamphetamine at the time of his death and that methamphetamine can make a person feel euphoric, aggressive, or violent.

*E. The Defendant's testimony*

The Defendant's testimony presented a radically different description of the events that led up to the shooting. The Defendant testified that there was nothing wrong with the way he had parked at Windjammer and that Mr. Smith could have easily gotten his truck out of the parking space. However, according to the Defendant, once he was inside the bar, Mr. Smith came up to him and said, "are you the asshole driving the gray truck . . . you need to move your f-----g truck." The Defendant testified that he told Mr. Smith that he did not want any trouble and that they should go outside and they would see Mr. Smith was not blocked in. According to the Defendant, Mr. Smith then responded by saying "this is my f-----g bar . . . you don't f-----g belong here . . . you need to f-----g leave."

The Defendant further testified that when he went outside, Mr. Smith had about seven or eight young men waiting on him. According to the Defendant, as he tried to reenter the bar, Mr. Eagan said to him "you don't realize who you're f-----g with motherf----r" and "when you get ready to leave, we're going to take you out back and we're going to kill you." The Defendant testified that he then told the men they had way too much to drink, that he was not looking to start any trouble, and "y'all have already seen the tags on my truck." Then, according to the Defendant, as they reentered the bar Mr. Eagan said, "do you think cause you're a cop that we won't kill you . . . we don't give a f--k that you're a cop." The Defendant testified that he asked Mr. Reynolds to throw Mr. Eagan and Mr. Smith out but that Mr. Reynolds "just stared at me like I hit him in the head with a hammer." According to the Defendant, Mr. Eagan continued to threaten him after he sat back down saying, "I'm looking at a dead motherf----r and that motherf----r is you." The Defenndant testified that later, Mr. Smith walked up to him while talking on a cell phone and told him, "they're going to be waiting out front for you when you try to leave and they're going to kill [you] . . . you're dead."

According to the Defendant, he then attempted to ask Mr. Reynolds for help again. The Defendant claims he asked Mr. Reynolds to call 911 and told him, "I've got men that I don't even know saying they're going to kill me . . . obviously they must think I have nothing left to lose but I do." The Defendant also testified that he told Mr. Reynolds that "the guy with the beard said that I'm a dead motherf----r" and denied ever saying "those are two dead motherf-----s over there." According to the Defendant, Mr. Reynolds smelled of alcohol and

just stared at him before going over to join Mr. Eagan and Mr. Smith as they all stared at him. However, Mr. Reynolds testified that the Defendant never asked him to call 911 and that after he split up the Defendant and Mr. Eagan, neither Mr. Eagan nor Mr. Smith bothered the Defendant for the rest of the night.

The Defendant testified that he was not staring at Mr. Eagan, instead he was watching him so he could escape out the front door when he accidently bumped into Ms. Ravinuthala's chair. Then, according to the Defendant, Mr. Eagan "like a bat out of hell . . . makes a beeline straight to me and he gets up in my face" and said, "it's time for you to die." The Defendant testified that this was when he drew his weapon and attempted to arrest Mr. Eagan and that as he was attempting to get Mr. Eagan on the ground, someone hit him on the back. The Defendant further testified that once he was on the ground, several men began hitting him on the face and chest. He was hit on the chin with a sharp object, and the men were trying to pry his gun away from him. The Defendant testified that he fired only one shot, not aiming at anyone, and that he did so only to save his life and to avoid being killed with his own gun. The Defendant testified that he crawled out from underneath the pile of men and that he disarmed only after Mr. Eagan, Mr. Smith, and the 15 other men that were with them had left the bar. The Defendant also testified that he told Officer Klein about the threats and that he was attempting to arrest Mr. Eagan when he was attacked.

On cross-examination, the Defendant admitted that the weapon he used was not his service weapon and that it was both illegal and against department regulations for him to have his gun with him inside the Windjammer. The Defendant also admitted that Mr. Eagan had nothing in his hands and had no weapon out when the Defendant pulled his gun. On cross-examination, the Defendant stated that the other witnesses' testimony was wrong and that he had asked Mr. Reynolds five or six times to call 911. When asked why he did not use his cell phone, the Defendant stated he left it in his truck to be polite toward Mary and Ms. Lampley. When asked why he did not ask to use Mary or Ms. Lampley's cell phone, the Defendant responded that he did not know if the women were "in league with these people" and perhaps they had lured him to the Windjammer to be killed. The Defendant on cross-examination further testified that he was attempting to arrest Mr. Eagan for three counts of aggravated assault even though Mr. Eagan had not caused serious bodily injury to another and had not displayed a deadly weapon.

*II. Procedural Background*

Following a five day trial, the jury convicted the Defendant of one count of second degree murder with respect to Mr. Munsey, a Class A felony; one count of attempted second degree murder with respect to Mr. Smith, a Class B felony; one count of attempted voluntary manslaughter with respect to Mr. Eagan, a Class D felony; one count of possession of a

-8-

firearm where alcoholic beverages are served, a Class A misdemeanor; and one count of use of a firearm during the commission of a dangerous felony, a Class D felony. After a sentencing hearing, the trial court sentenced the Defendant to 23 years for the second degree murder conviction, 12 years for the attempted second degree murder conviction, 4 years for the attempted voluntary manslaughter conviction, and 11 months and 29 days for the possession of a firearm where alcoholic beverages are served conviction. The trial court ordered these sentences to be served concurrently. The trial court also imposed a mandatory three-year sentence for use of a firearm during the commission of a dangerous felony to be served consecutively to the attempted second degree murder conviction.

During the trial, three major evidentiary issues were dealt with by the trial court. First, after the State had put on its first few witnesses, the Defendant proffered the testimony of Phillip Burkes. Defense counsel stated that Mr. Burkes was expected to testify that on July 28, 2007, he was involved in a verbal altercation with Mr. Munsey about a skipping compact disc at the Windjammer. Mr. Burkes was further expected to testify that as he left the Windjammer, he was attacked by Mr. Munsey and another unknown assailant. Mr. Burkes' testimony was offered in support of the Defendant's self-defense claim and to establish Mr. Munsey as the first aggressor. The State objected to Mr. Burkes' testimony, and the trial court sustained the objection, ruling that there was "no significant issue about who was the first aggressor" because it was undisputed from the State's evidence that Mr. Munsey was the first aggressor. Similarly, prior to the Defendant's case-in-chief, defense counsel proffered the testimony of Stacy Harris, Mr. Munsey's girlfriend. Ms. Harris was expected to testify that on several prior occasions, Mr. Munsey physically abused her. The trial court ruled that Ms. Harris could not testify for the same reasons it had disallowed Mr. Burkes' testimony.

Second, during cross-examination, Mr. Bobbitt admitted that he had spoken to Mr. Smith and Mr. Eagan about the facts of the case before his testimony. On redirect examination, the State sought to have Mr. Bobbitt's statement to the police read to the jury. Defense counsel objected, and the State responded by arguing that defense counsel's cross-examination suggested Mr. Bobbitt "had a chance to adjust his testimony based on conversations he had with other witnesses," thereby allowing the State to rehabilitate the witness with his prior consistent statement. The trial court overruled defense counsel's objection and ruled that the State could not read Mr. Bobbitt's statement to the police to the jury but that they could ask Mr. Bobbitt if he gave a statement to police and if that statement was consistent with his testimony at trial.

Finally, prior to trial, the State filed a motion seeking to introduce evidence of the Defendant's prior bad acts pursuant to Tennessee Rule of Evidence 404(b). The State sought to introduce evidence regarding the end of the Defendant's marriage and his behavior during

the months leading up to the shooting. Specifically, the State sought to introduce evidence that the Defendant's behavior was increasingly erratic and that he began stalking and harassing his ex-wife, Jamie Jo Young, along with other members of her family and friends. The trial court denied the State's motion. However, the trial court allowed the Defendant's ex-wife to testify that she was divorced from the Defendant, that prior to the shooting she had moved to Mississippi with her children, and that she had started seeing a younger man. The trial court also allowed Ms. Young to testify that on the night of the shooting, she received a text message from the Defendant around 11:00 p.m.

## ANALYSIS

### *I. Sufficiency of the Evidence*

The Defendant contends that the evidence presented at trial was insufficient to sustain his convictions for second degree murder, attempted second degree murder, and attempted voluntary manslaughter. In support of this contention, the Defendant presents two arguments: (1) that given the evidence presented at trial, no reasonable jury could have found that the Defendant was not acting in self-defense; and (2) in the alternative, because the jury found that the Defendant was acting "in a state of passion produced by adequate provocation" with respect to Mr. Eagan, no reasonable jury could have found that his actions toward Mr. Munsey and Mr. Smith were not caused by adequate provocation. See Tenn. Code Ann. § 39-13-211(a). The State responds that the evidence was legally sufficient to support the Defendant's convictions and that the jury was within its prerogative in rejecting the Defendant's claim of self-defense. The State also responds that in a multi-count indictment, consistency in the verdicts is not required as long as "the evidence establishes guilt of the offense upon which the conviction was returned." See Wiggins v. State, 498 S.W.2d 92, 94 (Tenn. 1973).

An appellate court's standard of review when the defendant questions the sufficiency of the evidence on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). This court does not reweigh the evidence; rather, it presumes that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the state. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions regarding witness credibility, conflicts in testimony, and the weight and value to be given to the evidence were resolved by the jury. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). A guilty verdict "removes the presumption of innocence and replaces it with a presumption of guilt, and [on appeal] the defendant has the burden of illustrating why the evidence is insufficient to support the jury's

verdict." Id.; State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). "This [standard] applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of [both] direct and circumstantial evidence." State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999).

Second degree murder is statutorily defined as the "knowing killing of another." Tenn. Code Ann. § 39-13-210(a)(1). A person acts knowingly "when the person is aware that [their] conduct is reasonably certain to cause the result." Tenn. Code Ann. § 39-11-302(b). A person attempts to commit second degree murder when he or she acts with the intent to knowingly kill the victim and his or her conduct constitutes a substantial step toward the victim's death. Tenn. Code Ann. § 39-12-101(a)(3). Voluntary manslaughter is statutorily defined as "the intentional or knowing killing of another in a state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner." Tenn. Code Ann. § 39-13-211(a). A person attempts to commit voluntary manslaughter when he or she acts with adequate provocation with the intent to intentionally or knowingly kill the victim and his or her conduct constitutes a substantial step toward the victim's death. Tenn. Code Ann. § 39-12-101(a)(3).

*A. Self-defense*

Tennessee law provides that a person may use deadly force in self-defense when that person has a reasonable belief, based upon reasonable grounds, that there is an imminent, real danger of death or serious bodily injury. Tenn. Code Ann. § 39-11-611(b)(2). It is well established, under Tennessee law, "that whether an individual acted in self-defense is a factual determination to be made by the jury as the sole trier of fact." State v. Goode, 956 S.W.2d 521, 527 (Tenn. Crim. App. 1997) (citing State v. Ivy, 868 S.W.2d 724, 727 (Tenn. Crim. App. 1993)). The Defendant contends that Mr. Eagan and Mr. Smith had repeatedly threatened to kill him and that he only fired his gun because several men were beating him while trying to take his gun away from him. However, the only evidence offered to support this theory was the testimony of Ms. Lampley that the Defendant looked scared when he reentered the bar and the Defendant's own testimony. The Defendant's version of events was contradicted at trial by the testimony of several disinterested witnesses who stated that the Defendant was the aggressor and threatened to kill Mr. Eagan and Mr. Smith. Ms. Ravinuthala testified that after being tackled, the Defendant and Mr. Munsey "wrestled" on the ground for a short time before the Defendant pulled himself up and aimed his gun at Mr. Munsey before shooting him in the neck. The Defendant then aimed the gun at Mr. Smith and shot him as he was running away. Based upon the evidence presented at trial, it was well within the province of the jury to reject the Defendant's claim of self-defense. Accordingly, we conclude that the evidence was sufficient to support the jury's finding that the Defendant did not act in self-defense.

*B. Effect of the voluntary manslaughter conviction*

The Defendant alternatively asserts that because the jury found that he acted "in a state of passion produced by adequate provocation" with respect to Mr. Eagan, his actions toward Mr. Munsey and Mr. Smith must have also been supported by adequate provocation. The Defendant essentially makes two arguments in support of this theory: (1) that the verdicts are mutually exclusive and a guilty verdict for attempted voluntary manslaughter on one count logically excludes a finding of guilt for second degree murder and attempted second degree murder on the other counts; and (2) that the jury's verdict of attempted voluntary manslaughter with respect to Mr. Eagan means there was insufficient evidence to show that the Defendant was not acting "in a state of passion produced by adequate provocation" with respect to Mr. Munsey and Mr. Smith. The State responds that Tennessee law recognizes the doctrine of inconsistent verdicts which does not require consistency in verdicts for multiple count indictments. The State also responds that the evidence was sufficient to show that the Defendant did not act with adequate provocation against Mr. Munsey and Mr. Smith.

*1. Mutually exclusive verdicts*

The doctrine of mutually exclusive verdicts has not been addressed in our courts. Mutually exclusive verdicts exist when "a guilty verdict on one count logically excludes a finding of guilty on the other." Jackson v. State, 577 S.E.2d 570, 573 (Ga. 2003) (quoting United States v. Powell, 469 U.S. 57, 69 n. 8 (1984)). When two verdicts are mutually exclusive, the jury, "in order to find the defendant guilty on both counts, necessarily reached two positive findings of fact that cannot logically mutually exist." Id. at 574 (internal quotation marks omitted). For example, when a jury convicts a defendant on two counts arising from the same act and one count requires proof that the defendant acted negligently and the other count requires proof that the defendant acted intentionally the verdicts are considered to be mutually exclusive. Id. at 575. In contrast, inconsistent verdicts exist when the jury convicts a defendant of one offense and acquits the defendant on another offense even though "both counts stem from the same criminal transaction." Wiggins, 498 S.W.2d at 94. It has long been held that appellate courts will not disturb seemingly inconsistent verdicts because doing so would require inappropriate speculation as to the jury's reasoning and because each count in a multiple count indictment is treated as a separate indictment. Id. at 93-94.

The key difference between the two doctrines is that mutually exclusive verdicts involve two positive findings of fact, whereas inconsistent verdicts involve one positive finding of fact and "the failure to make a positive finding of fact as to the other." Jackson, 577 S.E.2d at 574 n. 3. The Defendant is correct that unlike an inconsistent verdicts situation, the jury made positive findings of fact regarding each of the first three counts of

-12-

the indictment. However, even if the doctrine of mutually exclusive verdicts were to apply in Tennessee, it would not apply to the Defendant's case. "The rule against mutually exclusive verdicts applies only where the convictions result from the same act involving the same victim at the same instant." Waits v. State, 644 S.E.2d 127, 130 (Ga. 2007). The Defendant's convictions were the result of three different acts, against three different victims, and, while occurring in rapid succession, that occurred at three different times. Accordingly, we conclude that the doctrine of mutually exclusive verdicts would not apply to the Defendant's case.

### 2. Adequate Provocation

The Defendant also contends that even if the mutually exclusive verdicts doctrine does not apply in this case, the fact that the jury found the Defendant acted in a state of passion produced by adequate provocation with regard to Mr. Eagan necessarily proves that the evidence was insufficient to show that his actions against Mr. Munsey and Mr. Smith were not caused by adequate provocation. In essence, the Defendant argues that if he was adequately provoked when he attacked Mr. Eagan, he was also adequately provoked when he shot Mr. Munsey and Mr. Smith because each event occurred in rapid succession. The Defendant, however, is mistaken in his assumption that adequate provocation as to one victim may be transferred to other victims. It has long been held under Tennessee law, and at common law, that a murder will only be reduced to voluntary manslaughter when the provocation was caused by the victim. See State v. Tilson, 503 S.W.2d 921 (Tenn. 1974); State v. Antonius Harris, No. W2001-02617-CCA-R3-CD, 2002 WL 31654814 (Tenn. Crim. App. Nov. 7, 2002), perm. app. denied (Tenn. March 17, 2003); State v. Khristian Love Spann, 1989 WL 86566 (Tenn. Crim. App. Aug. 3, 1989), perm. app. denied (Tenn. Nov. 6, 1989); see also Commonwealth v. LeClair, 840 N.E.2d 510 (Mass. 2006) (providing a history of the rule at common law and citing supporting cases from other jurisdictions); 40 C.J.S. Homicide § 114 (2010); 40 Am. Jur. 2d Homicide § 53 (2010).

The Tennessee Supreme Court first addressed this issue in Tilson, 503 S.W.2d at 921. The defendant in Tilson had been involved in a barroom brawl with several men prior to leaving the bar. Id. at 922. The defendant returned a short time later with a pistol and shot the victim who had taken no active part in the fight but had been "on the side" of the one provoking the fight. Id. at 923-24. Our supreme court held that the defendant's actions did not constitute voluntary manslaughter because he killed an unarmed man who was simply "on the side" of the person who provoked an earlier fight with the defendant. Id. Similarly, in a more recent decision, this court held that there was insufficient evidence to support a defendant's claim of adequate provocation when the defendant had kidnapped several people and was shot by one of the victims before he "shot his unarmed victim whom he had been

holding at gunpoint and who had done nothing to provoke the defendant." Harris, 2002 WL 31654814 at *12-13.

In the present matter, the jury found that Mr. Eagan adequately provoked the Defendant. However, there was little to no evidence that Mr. Munsey had any contact with the Defendant prior to the shooting. Accordingly, there was simply no evidence that Mr. Munsey provoked the Defendant. Mr. Munsey tackled the Defendant after he put a gun to Mr. Eagan's head, but when "a difficulty is provoked by the accused, the accused may not claim the benefit of sudden passion aroused by another." Harris, 2002 WL 31654814 at *13; see also 40 C.J.S. Homicide § 113 (2010). Put another way, "[t]he [D]efendant was the gun-wielding instigator of the criminal episode" and it was "his criminal acts that led" to Mr. Munsey's actions. Harris, 2002 WL 31654814 at *13.

With respect to Mr. Smith, several witnesses testified that they overheard the conversation between Mr. Smith and the Defendant and that there was nothing threatening about Mr. Smith's tone or words. Additionally, several witnesses, including Ms. Lampley, testified that Mr. Smith had no more contact with the Defendant after they reentered the bar. In fact, Mr. Smith was running away from the Defendant when he was shot. Therefore, despite their initial encounter, the evidence was sufficient for the jury to conclude that Mr. Smith had not provoked the Defendant. Based upon the evidence presented at trial, it was well within the jury's prerogative to find that Mr. Eagan provoked the Defendant but that Mr. Munsey and Mr. Smith had not. Even though the events leading up to the shooting began with the Defendant putting a gun to Mr. Eagan's head, whatever Mr. Eagan had done to provoke the Defendant could not provide the Defendant with adequate provocation for shooting Mr. Munsey and Mr. Smith. Accordingly, we conclude that the evidence was sufficient to sustain the Defendant's convictions for second degree murder, attempted second degree murder, and attempted voluntary manslaughter.

*II. Prior Violent Acts of the Victim*

The Defendant contends that the trial court erred by excluding the testimony of two witnesses regarding the prior violent acts of the victim, Mr. Munsey. The Defendant argues that the trial court's ruling was erroneous because the trial court excluded the evidence on the basis that there was "no significant issue about who was the first aggressor[,] Mr. Munsey was." The Defendant contends that he should have been able to corroborate the evidence that Mr. Munsey was the first aggressor with testimony about his prior violent acts. The Defendant also contends that this evidence was necessary to establish his self-defense theory and, therefore, the trial court's ruling violated his constitutional right to present witnesses favorable to his defense. The State responds that the trial court correctly excluded the testimony because Mr. Munsey's status as first aggressor was not at issue. The State also

-14-

responds that self-defense was not an issue at the time the Defendant proffered the testimony; therefore, the testimony was inadmissible. The State additionally responds that this evidence was not necessary for the Defendant to establish his theory of self-defense.

In cases where self-defense is an issue, "evidence concerning the [victim's] propensities for peacefulness and violence is generally admissible but is ordinarily limited to testimony concerning the [victim's] general reputation in the community." State v. Jerry Dale Bennett, No. 03C01-9304-CR-00115, 1994 WL 53645, at *3 (Tenn. Crim. App. Feb. 24, 1994). However, Tennessee law permits, under limited circumstances, evidence of specific violent acts of the victim in order to "corroborate the defendant's assertion that the victim was the aggressor." State v. Furlough, 797 S.W.2d 631, 649 (Tenn. Crim. App. 1990). Evidence offered to show that the victim "was the first aggressor is admissible once the issue of self-defense has been properly raised." Bennett, 1994 WL 53645 at *4 (citing State v. Lateral Jolly, No. 02C019207-CR-00169, 1993 WL 523590 (Tenn. Crim. App. Dec. 15, 1993), perm. app. denied (Tenn. May 16, 1994)). The issue of self-defense must "be at issue by the evidence in the record, not by the words and statements of counsel." Jolly, 1993 WL 523590 at *4. Until self-defense is an issue at trial, "any evidence of acts of the victim tending to show first aggression [are] irrelevant and the trial court's exclusion of the evidence [will be] absolutely correct." Id. at *3. Once self-defense is an issue at trial, "[t]hird persons may testify about violent acts or threats toward them about which the defendant had no knowledge at the time of the offense" if the evidence is offered to corroborate the defendant's claim that the victim was the first aggressor. Bennett, 1994 WL 53645 at *4 n. 6.

The Defendant is correct in his assertion that the trial court erred in excluding the evidence of Mr. Munsey's prior violent acts because there was "no significant issue about who was the first aggressor." The mere "existence of substantial evidence . . . establishing the victim as the aggressor does not, by itself, preclude the admission" of evidence of the victim's prior violent acts. State v. Saylor, 117 S.W.3d 239, 249 (Tenn. 2003). However, the Defendant proffered this evidence prior to the presentation of his case-in-chief. While we note that the issue of self-defense can be raised from the State's evidence, there was no evidence in the State's case-in-chief that suggested the Defendant reasonably believed there was an imminent, real danger of death or serious bodily injury. See generally State v. Joe C. Anderson, No. E1999-02485-CCA-R3-CV, 2000 WL 1285258 (Tenn. Crim. App. Sept. 12, 2000), perm. app. denied (Tenn. March 5, 2001). In fact, at the time the Defendant proffered the evidence of Mr. Munsey's prior violent acts, all the evidence at trial had shown that the Defendant was the aggressor: threatening to kill Mr. Eagan and Mr. Smith, staring down Mr. Eagan and Mr. Smith, and putting a gun to Mr. Eagan's head. There was no evidence that Mr. Smith, Mr. Eagan, Mr. Munsey or anyone else had threatened the Defendant's life. Additionally, the evidence showed that after a short scuffle on the floor,

the Defendant pulled up above Mr. Munsey, aimed the gun at him, and shot him. At the time the Defendant proffered the testimony, the issue of self-defense had not been raised. Accordingly, we conclude that the trial court was correct in excluding the testimony regarding Mr. Munsey's prior violent acts.

In respect to the Defendant's contention that the excluded evidence was necessary to establish his theory of self-defense, "we note that whether excluded evidence is critical to a defense is a fact-specific inquiry." State v. Flood, 219 S.W.3d 307, 317 (Tenn. 2007). The Defendant sought to introduce this evidence to corroborate that Mr. Munsey was the first aggressor. However, all the evidence at trial established that Mr. Munsey tackled the Defendant after he put a gun to Mr. Eagan's head. While this evidence would have bolstered the Defendant's claim that Mr. Munsey was the first aggressor, it was not critical to the Defendant's theory of self-defense. Additionally, the Defendant's theory of self-defense at trial was based on the alleged threats to his life made by Mr. Eagan and Mr. Smith. There was little to no evidence at trial that the Defendant had any interactions with Mr. Munsey prior to the shooting. Therefore, Mr. Munsey's prior violent acts were not critical to the Defendant's theory of self-defense. Accordingly, we conclude that the trial court's ruling did not violate the Defendant's constitutional right to present witnesses favorable to his defense.

### III. Evidence of the Defendant's Divorce

The Defendant contends that the trial court erred when it allowed the testimony of Jamie Jo Young, the Defendant's ex-wife, regarding their divorce and her moving their children to Mississippi. The Defendant argues that this was evidence of "other crimes, wrongs, or acts" not admissible under Tennessee Rule of Evidence 404(b) and that the evidence was not necessary to provide a contextual background to the jury. The State responds that Ms. Young did not testify about any prior bad acts of the Defendant; therefore, Rule 404(b) is not implicated in this case. Instead, the State argues the evidence was admissible because it was relevant and its probative value was not substantially outweighed by the danger of unfair prejudice.

Tennessee Rule of Evidence 401 provides that "'[r]elevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Generally, relevant evidence is admissible, while irrelevant evidence is inadmissible. Tenn. R. Evid. 402. However, relevant evidence may be excluded if its probative value is "substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." Tenn. R. Evid. 403. "The admissibility of evidence under Rule 403 of the Tennessee Rules of Evidence is a matter within the trial court's discretion

and will not be reversed on appeal absent an abuse of that discretion." State v. Biggs, 218 S.W.3d 643, 667 (Tenn. Crim. App. 2006) (citing State v. DuBose, 953 S.W.2d 649, 652 (Tenn.1997)).

The trial court ruled that Ms. Young's testimony was relevant considering the testimony of other witnesses about the Defendant's statements regarding his divorce and that he had lost his family. The trial court also found that the probative value of Ms. Young's limited testimony was not outweighed by its prejudicial effect "by any stretch of the imagination." The State's theory at trial was that the Defendant's personal life had unraveled; therefore, he went out on the night of March 13, 2008, with a short fuse. Accordingly, we agree with the trial court that Ms. Young's testimony was relevant. As for whether the probative value of Ms. Young's testimony was substantially outweighed by the danger of unfair prejudice, we again agree with the trial court that given the very limited nature of Ms. Young's testimony, its probative value was not substantially outweighed by the danger of unfair prejudice. Accordingly, we conclude that the trial court did not err in admitting the testimony of Ms. Young.

*IV. Prior Consistent Statement*

The Defendant contends that the trial court erred when it allowed Mr. Bobbitt to testify that his statement to the police was consistent with his trial testimony. The Defendant argues that "there was no insinuation of recent fabrication or deliberate falsehood" during defense counsel's cross-examination of Mr. Bobbitt. The State responds that defense counsel's cross-examination impeached Mr. Bobbitt's credibility by insinuating that he had colluded with other witnesses to fabricate their trial testimony. According to the State, once Mr. Bobbitt's credibility had been impeached it was within the trial court's discretion to allow Mr. Bobbitt to testify about his statement to the police in order to rehabilitate his credibility.

This court has held that "[o]rdinarily, it is impermissible to corroborate a witness' testimony by evidence of the witness making prior consistent statements, absent an impeaching attack on that testimony." State v. Meeks, 867 S.W.2d 361, 374 (Tenn. Crim. App. 1993) (citing State v. Braggs, 604 S.W.2d 883, 885 (Tenn. Crim. App. 1980)). However, there are two circumstances in which prior consistent statements may be admissible. The first is where a prior consistent statement is allowed "to rebut the inference that the witness's testimony was a recent fabrication." State v. Bush, 942 S.W.2d 489, 516 (Tenn. 1997). The second is when a witness's prior statement is used out of context to cross-examine the witness. State v. Boyd, 797 S.W.2d 589, 593-94 (Tenn. 1990). However, a prior consistent statement will not be admissible unless "the witness' testimony . . . [has] been assailed or attacked to the extent that the witness' testimony needs rehabilitating." State

v. Hodge, 989 S.W.2d 717, 725 (Tenn. Crim. App. 1998) (citing State v. Benton, 759 S.W.2d 427, 434 (Tenn. Crim. App. 1998)).

On cross-examination, defense counsel questioned Mr. Bobbitt at length about whether he had spoken to Mr. Eagan and Mr. Smith about the facts of the case prior to his testimony. Defense counsel's questions established that Mr. Eagan, Mr. Smith, and Mr. Bobbitt had discussed the facts of the case prior to Mr. Bobbitt's testimony that morning. Defense counsel also repeatedly asked Mr. Bobbitt about what occurred when the three men "went over some of the facts of the case." Defense counsel's questioning on cross-examination implied that Mr. Bobbitt, Mr. Smith, and Mr. Eagan had colluded to fabricate their testimony and to get their stories straight. Defense counsel never specifically asked Mr. Bobbitt if he had fabricated his testimony. However, as noted above, a prior consistent statement may be used to rebut a mere inference that the witness' testimony was a recent fabrication. Accordingly, we conclude that the trial court did not err in allowing Mr. Bobbitt to testify that his testimony was consistent with the statement he gave police on the night of the shooting.

*V. Sequential Jury Instructions*

The Defendant contends that the trial court erred in giving the jury sequential jury instructions, which required the jury not to consider any lesser-included offenses unless it first acquitted the Defendant of the indicted offense and each successive lesser-included offense. The Defendant argues that the sequential jury instructions were misleading to the jury and violated his due process right because the jury instructions precluded consideration by the jury of all the legal issues. The Defendant specifically contends that the trial court's instruction for second degree murder did not include the distinction between second degree murder and voluntary manslaughter. Instead, the trial court placed this distinction after the voluntary manslaughter charge. The State responds that our supreme court has upheld the constitutionality of sequential jury instructions and that this court has repeatedly upheld sequential jury instructions with respect to second degree murder and the lesser-included offense of voluntary manslaughter.

Our supreme court has upheld sequential jury instructions concluding that their use does not violate the constitutional rights of a defendant and that there are significant policy considerations that favor their use. State v. Davis, 266 S.W.3d 896 (Tenn. 2008). This court has repeatedly upheld sequential jury instructions when, like the present case, "the distinction between second degree murder and voluntary manslaughter was placed after the voluntary manslaughter charge." State v. Mark Hines, No. W2009-00450-CCA-R3-CD, 2010 WL 4286132, at *10 (Tenn. Crim. App. Oct. 27, 2010); see also State v. Billie Joe Welch, No. E2005-02293-CCA-R3-CD, 2006 WL 2737830 (Tenn. Crim. App. Sept. 26, 2006), perm.

app. denied (Tenn. Feb. 26, 2007); State v. Walfrido L. Rodriguez, No. M2005-01351-CCA-R3-CD, 2006 WL 1626845 (Tenn. Crim. App. June 7, 2006), perm. app. denied (Tenn. Oct. 30, 2006). Again, we note that the better practice is to adhere to the approach in the Tennessee Pattern Jury Instruction which provides the distinction between second degree murder and voluntary manslaughter in the instruction for second degree murder. See Hines, 2010 WL 4286132 at *10; Welch, 2006 WL 2737830 at *14; State v. Earnest Gwen Humphrey, No. M2003-01489-CCA-R3-CD, 2005 WL 2043778, at *14-15 (Tenn. Crim. App. Aug. 24, 2005) (Tipton, J. concurring), perm. app. denied (Tenn. Feb. 6, 2006). However, the Defendant's due process rights were not violated because "prior to their deliberation, the jury . . . was fully and accurately instructed concerning provocation, passion, and the difference between second degree murder and voluntary manslaughter." Welch, 2006 WL 2737830 at *14. Accordingly, we conclude that this issue is without merit.

## CONCLUSION

Upon consideration of the foregoing and the record as a whole, the judgments of the trial court are affirmed.


_____
D. KELLY THOMAS, JR., JUDGE

-19-